UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ERIC McALPINE,

                                                    Petitioner,

            vs.                                                      9:02-CV-1081
                                                                     (J. Kahn)

THOMAS M. POOLE, Superintendent,
Five Points Correctional Facility,

                                                    Respondent.

_____

APPEARANCES                              OF COUNSEL

ERIC McALPINE
Petitioner pro se

ELIOT SPITZER                            SENTA B. SIUDA
Attorney General of the                  Asst. Attorney General
State of New York
Attorney for Respondent

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the
Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. §
636 (b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner has brought this action for a writ of habeas corpus pursuant to 28
U.S.C. § 2254.  Petitioner challenges a May 8, 1998 judgment of conviction of the
Onondaga County Court.  Petitioner was convicted after a jury trial of Attempted
Murder, Second Degree; Criminal Possession of a Weapon, Second Degree; Criminal
Possession of a Weapon, Third Degree; Reckless Endangerment, First Degree; and

Menacing, Second Degree.  On May 26, 1998, petitioner was sentenced to concurrent terms of 12-25 years for the Attempted Murder; 7½-15 years for the second degree weapons conviction; 3½-7 years for the third degree weapons conviction; 3½-7 years for Reckless Endangerment; one year for the Menacing conviction.

On February 7, 2001, the Appellate Division, Fourth Department affirmed petitioner's conviction, and on June 18, 2001 the New York Court of Appeals denied leave to appeal. *People v. McAlpine*, 280 A.D.2d 977, 720 N.Y.S.2d 420 (4ᵗʰ Dep't 2001), *lv. denied*, 96 N.Y.2d 865, 730 N.Y.S.2d 39, 754 N.E.2d 1122 (2001). Petitioner also filed a motion to vacate his conviction in the Onondaga County Court pursuant to N.Y. CRIM. PROC. LAW § 440.10.  That motion was denied on February 25, 2002, and although on July 3, 2002, petitioner received an extension of time to appeal the denial of the section 440.10 motion, he states in his habeas petition that he did not appeal the denial of the motion to vacate because the issues raised were "meritless." Petition (Dkt. No. 1) at 4.  Petitioner filed this application for habeas corpus relief on August 21, 2002. (Dkt. No. 1).

On March 26, 2004, long after the respondent had filed his answer and memorandum of law, petitioner moved to have this action stayed while he returned to state court to file a motion for writ of error coram nobis in the Appellate Division, raising a claim of ineffective assistance of appellate counsel. (Dkt. No. 11). Respondent opposed this motion, and petitioner filed a reply. (Dkt. Nos. 13, 14).  On June 21, 2004, I granted petitioner's motion based on a concern regarding the statute of limitations. (Dkt. No. 16).  I also ordered that petitioner file status reports regarding the progress of his state court proceedings.

2

On April 29, 2004, petitioner filed what is labeled an application for writ of error coram nobis and is addressed to the Appellate Division, Fourth Department. (Dkt. No. 15).  This document and its accompanying memorandum of law were filed as a "status report", although there was no explanatory letter attached to the documents.  The court assumes that petitioner was attempting to keep the court informed of what petitioner had filed in the Appellate Division.  Petitioner never filed any additional status reports.  On March 7, *2006*, I ordered petitioner to file a status report and to show cause why the stay should not be lifted. (Dkt. No. 18). On April 11, 2006, petitioner filed a letter, dated April 8, 2006, in response to my March 7, 2006 order, stating that the inmate who was supposed to be assisting petitioner with his state court proceedings never "completed the action mentioned in [his] request to hold the habeas application in abeyance." (Dkt. No. 20).  In that letter, petitioner stated that he consented to the case "moving forward."

Although petitioner seems to state in his April 8, 2006 letter that the motion for writ of error coram nobis was never "completed,"[1] it appears that petitioner *did* file a motion for writ of error coram nobis which was denied on ***July 9, 2004*** by the Appellate Division. *People v. McAlpine*, 9 A.D.3d 920, 779 N.Y.S.2d 799 (4th Dep't 2004).  It is unclear why the motion for writ of error coram nobis was denied because there is no opinion accompanying the denial.  It does not appear that the denial of the writ was appealed.

Based on petitioner's letter consenting to proceed with this action, this court has

---

[1] It is also unclear why petitioner states that the motion for writ of error coram nobis was not "completed" because he filed a copy of the completed motion together with a memorandum of law in 2004 in this court. (Dkt. No. 15).

issued an order lifting the stay (Dkt. No. 21) and will now consider the habeas petition on the original claims.  However, this court must note that this case exemplifies the dangers of "staying" actions while petitioners purportedly return to state court to exhaust claims that they originally filed in their federal habeas petitions and particularly when petitioners ask to go back to state court to exhaust claims that they did not bring in their original petition.  Petitioner filed this action in August of 2002, and it was ready for decision in December of *2002*.  It is now *2006*, and petitioner is proceeding on the ***original claims***.  The court attempts to regulate the length of time that a case is stayed by requiring status reports, however, if the petitioner does not file these reports, the court cannot follow each case to determine whether the stay is still warranted or is becoming too lengthy.

Petitioner raises three claims for review by this court:

1.    Petitioner was denied effective assistance of trial counsel.

2.    The verdict was against the weight of the evidence.

3.    Petitioner's sentence was excessive.

Respondent has filed an answer and memorandum of law, together with the pertinent state court records.[2]  Respondent argues for denial of the petition based upon the merits as well as procedural default.  For the following reasons, this court agrees with respondent and will recommend denial of the petition.

## DISCUSSION

1.    <u>Facts</u>

Petitioner's conviction in this action was the result of a shooting incident that

---

[2] The state court records are listed on pages 2-3 of the answer. (Dkt. No. 9).

occurred on December 4, 1997.  At approximately midnight, petitioner and his co-defendant were driving in a grey Chevrolet Corsica.  They fired five shots at three individuals who were standing on a street corner.  The shots were heard by two Syracuse police detectives, Nicolas Vassenelli and Gary Coe, who happened to be driving near by. Trial Transcript (T) at 338-41.  The officers were working undercover that night and were driving northbound down Midland Avenue in the City of Syracuse. (T. 339).

The officers passed the three individuals on the street, and Detective Vassenelli testified that as they passed the three individuals, Vassenelli also noticed a car with its lights on parked at the corner of Midland Avenue on the same side of the street as the three individuals. (T. 340).  After the officers passed the car, they immediately heard shots. (T. 441).  The officers turned their car around and proceeded back to the location from which the shots came. (T. 341-42).  By the time the detectives turned around, the car was gone, and the detectives stopped to assist the people on the street. (T. 342-43).

After making sure that the individuals on the street did not have any weapons, the officers transmitted a description of the vehicle over the police radio. (T. 343). The description of the car was obtained from the individuals on the street as a grey Chevrolet Corsica. (T. 344).  The individuals were standing in front of 1524 Midland Avenue. (T. 344).  After determining that the individuals on the street were unarmed, Detective Vassenelli began to look for projectiles that might have been fired into the house. (T. 344).

While Detective Vassenelli was looking for projectiles, he heard one of the

individuals yell "oh shit." (T. 345).  Detective Vassenelli turned around and saw the grey Corsica pulling up again, a black male extended his arms out of the passenger side window of the car and pointed a gun directly at Detective Vassenelli and one of the three individuals who had been standing on the street. (T. 345).  Detective Vassenelli crouched down, reached for his weapon and radioed to report that the vehicle had returned to the scene. (T. 346).  Detective Vassenelli was also able to radio a portion of the license plate number at that time. (T. 346).  The vehicle then proceeded down Midland Avenue at a high rate of speed. (T. 347).

Detective Vassenelli testified that the officers got back into their car and followed the Corsica. (T. 347).  The detectives watched the vehicle go down Midland Avenue and take a left onto Warner Avenue. (T. 349).  They followed the car to Warner Avenue, and when the officers saw the car again, it was stopped, but still had its lights on. (T. 349).  As the detectives pulled up to the car, they realized that it was still running, but the occupants had left the car. (T. 349).  The detectives radioed for backup, and although they searched the area for suspects, none were found at that time. (T. 349-50).

The detectives returned to the scene of the shooting to speak with the victims, however, only two of them remained and agreed to go to the Criminal Investigations Division (CID) and be interviewed by the detectives. (T. 350).  Detectives Quonce and Broton located the owner of the Corsica. (T. 351).  They spoke with the owner, and he stated that he had loaned the car to petitioner. (T. 352).  Petitioner lived at 344 Warner Avenue, across the street from where the car was found unoccupied. (T. 352).

Detective Gordon Quonce testified that he and his partner, Detective Shawn

Broton were on duty on the night of the shooting. (T. 438).  Detective Quonce stated that he and Detective Broton heard the "shots fired" call over the radio by Detectives Coe and Vassenelli. (T. 439).  Detectives Quonce and Broton started driving toward the area of the shooting when they heard Detectives Coe and Vassenelli over the radio again, stating that the suspect car had returned to the scene of the shooting and then reported the direction in which the car was going. (T. 439).  Detectives Quonce and Broton proceeded to the corner of Cannon and Warner Streets to secure the area so that a search could be conducted of the area in which the unoccupied car was found. (T. 441).

Although no suspects were found as a result of that search, Detectives Quonce and Broton went back to their office, where they learned the information regarding the owner of the car, which led them to developing petitioner as a suspect. (T. 441-42). Detectives then went to petitioner's home, but did not find him there. (T. 352-53). However,  Detective Quonce testified that when the detectives arrived at petitioner's address, he went around to the back of the house while the other detectives approached from the front so that no one could leave the house through the back door. (T. 442-43).

Detective Quonce testified that while he was at the rear of petitioner's home, he could see a small door, leading to a crawl space beneath the house. (T. 443).  The door was partially opened, and he could see broken cobwebs around the door, indicating that the door had been recently opened. (T. 443).  Detective Quonce stated that he looked through the doorway and saw a handgun laying inside the opening of the door. (T. 443).  Detective Quonce opened the door a little further and saw another handgun

7

inside. (T. 444).  Both of the guns had magazines in them, although Detective Quonce could not immediately tell whether the weapons had live rounds in the magazines. (T. 449).  However, Detective Quonce stated that he could tell that one of the guns had two rounds jammed in the chamber. (T. 449).  It was later determined that the guns recovered by the detectives were the two guns used in that night's shooting incident.

Petitioner was ultimately found at 1084 West Onondaga Street. (T. 353).  He agreed to go to CID and speak with the detectives. (T. 353, 452).  Petitioner rode to CID with detectives Vassenelli and Coe, and upon his arrival at CID, he was placed in an interview room. (T. 355).  He was interviewed by Detective Broton. (T. 355, 524).  Petitioner waived his *Miranda* rights and consented to speak with Detective Broton. (T. 527-31).  Plaintiff also consented to execute a written statement regarding his involvement in the shooting incident. (T. 532-36).  Detective Broton read petitioner's written statement to the jury. (T. 537-39).  In this statement, petitioner acknowledged that he had done "something stupid".  Petitioner stated that he was out in front of a bar with Jondell Middlebrooks, and that Jondell told petitioner that some individuals from the Boot Camp gang had broken some of Jondell's mother's windows. (T. 537).  Petitioner further stated that he and Jondell got into the Corsica, and that petitioner knew that there were two guns in the back seat of the car. (T. 538).  Petitioner initially drove the car to Midland Avenue and was holding one of the guns, however, it was Jondell who fired the initial shots.[3] (T. 538).

---

[3] The court notes that both petitioner's and his co-defendant's written statements indicate that there were only two initial shots fired, (T. 538, 574), however, the witnesses testified that they heard five shots fired, and the police evidence technician found four casings on the roadway outside the Midland Avenue house and *five* impact holes in the front of the house. (T. 465).

8

Petitioner's statement also indicated that after Jondell fired the first shots, they drove around the corner, but then returned to see if "Little G had gone and gotten his boys." (T. 538). Before they returned, however, petitioner changed places with Jondell, so that the second time they drove in front of the Midland Avenue house, Jondell was driving. (T. 538). Petitioner stated that as they drove by, they saw a couple more people outside the house, and petitioner first thought that they were some Boot Camp gang members. *Id.* Petitioner stated that he pointed the gun out the window because he was "fixing to shoot a couple more shots" when he realized that the additional people were police officers. *Id.* Petitioner stated that he pulled the gun back into the car, told Jondell that "it was five-oh", and told Jondell to leave the area. *Id.* Petitioner stated that he "only had the gun to bluff", and that he was not "trying to kill anybody." (T. 539).

Detective Broton testified that he looked at one of the guns and noticed that it was jammed. (T. 539). He asked petitioner if he knew the gun was jammed, and petitioner stated that he did. (T. 540). Detective Broton then asked petitioner if he knew what to do when a gun jammed, and petitioner explained how he would clear the jam. (T. 540). Detective Broton testified that petitioner's explanation was correct. *Id.*

Petitioner's co-defendant also gave the police a statement. (T. 573-75). Jondell Middlebrooks's statement was very similar to petitioner's statement. Middlebrooks stated that after he fired the first shots, he and petitioner changed positions in the car and went back to Midland Avenue the second time to see if they "had hit Little G." (T. 574). Jondell stated that as he slowed the car down, petitioner pointed the gun out the window in the direction of the people, and petitioner was "getting ready to shoot"

9

when he realized that it was the police, and told Jondell to leave the area. *Id.*

Petitioner and Jondell Middlebrooks were tried together. Middlebrooks testified on his own behalf at the trial. He stated that when they arrived at Midland Avenue, they pulled over and saw Andrew Logan speaking with two other people on the street. (T. 646). As they pulled up in front of the house, the two other people started walking away, and Middlebrooks said "what up" to Logan, who came close to the car and asked "who dat." (T. 646). Middlebrooks stated that he pointed the gun out of the window, but Logan saw the gun and started to run toward the stairs of the house. (T. 646). Middlebrooks stated that he did not want to hurt Logan, only "bluff" him, so he fired two shots. (T. 647). Logan ran up the stairs of the house and ducked. (T. 647). Middlebrooks stated that he fired another two shots, and they left the area. *Id.*

Middlebrooks then stated that after they left, they returned to the area because he "wanted to make sure that I didn't hit him because I never had a problem with him, just bluff him, so we were going to go back and bluff him again." (T. 648). Middlebrooks testified that he and petitioner changed positions and then drove back to Midland Avenue, where petitioner pointed the gun out of the window, but realized that there were police on the scene, pulled himself back into the car, and he and Middlebrooks drove away. *Id.*

The jury found petitioner guilty of Attempted Murder, Second Degree; Criminal Possession of a Weapon, Second Degree; Criminal Possession of a Weapon, Third Degree; Reckless Endangerment, First Degree; and Menacing, Second Degree.

**2.**    **Weight of the Evidence**

   **A.  Exhaustion of State Remedies**

   Petitioner filed his petition for writ of habeas corpus and a memorandum of law in support of his petition. (Dkt. Nos. 1, 3).  In the petition itself, petitioner claims that the verdict of guilt on the attempted murder charge was against the weight of the evidence.  Petitioner claims that he could not have fired the gun at the victim because the gun was "inoperable", the prosecutor failed to prove "shared intent", and the victim's testimony at trial was inconsistent with his grand jury testimony. (Dkt. No. 1). In petitioner's memorandum of law, he expands on this argument and also claims that a rational trier of fact could not have found the elements of the "crimes" beyond a reasonable doubt. (Dkt. No. 3 at 10-13).

   Respondent first argues that petitioner has not exhausted this claim in state court.  The law is well-settled that prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust his state court remedies with respect to each claim presented in his federal application for habeas relief. *Baldwin v. Reese*, 541 U.S. 27 (2004).  The petitioner must "fairly present" his claims in each appropriate state court, alerting the court to the ***federal nature*** of the claim. *Id.* (quoting *Duncan v. Henry*, 513 U.S. 364, 36-66 (1995)).  The petitioner must have informed the state court of ***both*** the factual ***and*** legal premises of the claims that he is attempting to bring in federal court. *Id.*

   As the Second Circuit has recently held, in order for a petitioner to "invoke 'one complete round of the State's established appellate review process", he must first appeal his conviction to the Appellate Division and then must seek further review of

11

the conviction by applying for leave to appeal to the New York Court of Appeals. *Smith v. Duncan*, 411 F.3d 340, 345 (2d Cir. 2005)(quoting *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005)).  Applicants for leave to appeal must submit briefs and other documents to the Court of Appeals, identifying the issues upon which the application is based, and must focus upon identifying problems of reviewability and preservation of error. *Id.*

The court in *Smith v. Duncan* specifically stated that the Court of Appeals would construe a petitioner's leave application as abandoning any claims that were presented to the Appellate Division, but not included in the leave application. *Id.*  The Second Circuit has previously held this to be the law.  In *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991), the court held that where a petitioner requested review by the New York Court of Appeals of only one of three issues raised in the Appellate Division, the other two claims were not presented for exhaustion purposes.  The court found that it would undermine the principles of comity to consider a constitutional claim as to which no ruling was requested from the state court. *Id.*

The court would first point out that in the petition, petitioner is raising a "**weight of the evidence**" claim, but also uses language that refers to the standard of "**legal sufficiency**."  In his Appellate Division papers, petitioner raised only a claim that the verdict was against the "**weight of the evidence.**"  Petitioner's Appellate Division Brief at 12-15.  Under New York State law, the two claims are related, but have distinctly different standards. *See People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987).  A claim that the verdict is against the "**weight of the evidence**" is a purely state law claim, based upon N.Y. Crim. Proc. Law §

470.15, whereas a **legal sufficiency** claim is based upon federal constitutional principles. *See Garbez v. Greiner*, 01 Civ. 9865, 2002 U.S. Dist. LEXIS 13806, *24-25 (S.D.N.Y. July 30, 2002)(citing *People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)).

The petitioner has a heavy burden in a **legal sufficiency** of evidence claim. *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996).  The well-established Supreme Court precedent provides that a court must determine whether any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1970)).  The evidence must be viewed in the **light most favorable to the prosecution**. *Id.*

Issues of credibility are for the jury to resolve. *Vera v. Hanslmaier*, 928 F. Supp. at 284 (citation omitted).  Under federal standards, a conviction may also be based on circumstantial evidence "so long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct." *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994).

However, in a claim that the verdict was against the weight of the evidence, the appellate court's analysis is not limited to the legal sufficiency test and must go further. *People v. Bleakley*, 69 N.Y.2d at 495, 515 N.Y.S.2d at 763, 508 N.E.2d at 674-75.  Even if all the elements of a charge are supported by some credible evidence, in a weight of the evidence analysis, the court must determine that a different finding would not have been unreasonable and then must

> weigh the relative probative force of conflicting testimony
> and the relative strength of conflicting inferences that may

> be drawn from the testimony.  If it appears to the court that
> the trier of fact has failed to give the evidence the weight
> that it should be accorded, then the appellate court may set
> aside the verdict.

*Id.*  Clearly the New York State law standard is substantially stricter that the

constitutional standard.  Regardless of exhaustion, errors of state law are ***not*** grounds

for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Thus, in this case,

to the extent that petitioner claims that the verdict was against the "weight of the

evidence," the claim may be dismissed as not cognizable in federal court.

To the extent that petitioner may have raised or the Appellate Division may

have considered a "legal sufficiency" claim,[4] the court will proceed with the

exhaustion analysis.  In this case, petitioner's appeal to the Appellate Division

included the weight of the evidence claim, the ineffective assistance of counsel claim,

and the excessive sentence claim. Petitioner's Appellate Division, Fourth Dep't Brief.

On August 28, 2000, petitioner's counsel attempted to withdraw the ineffective

assistance of counsel and excessive sentence claims from consideration,[5] however, the

Appellate Division, Fourth Department affirmed the conviction ruling on all issues,

---

[4] The Appellate Division's decision states that "[a]s we determined on the appeal of the codefendant, the verdict is not against the weight of the evidence ... ." 280 A.D.2d at 977, 720 N.Y.S.2d at 420.  Clearly, the Appellate Division engaged in the more stringent state law analysis of actually weighing the evidence, however, in order to get to the stricter analysis, the court would have to find that the evidence was legally sufficient also, even though there was no such specific finding. Because this court finds that petitioner has not exhausted his state court remedies due to his failure to raise ***any sufficiency*** of evidence claim in the New York Court of Appeals, the court does not have to decide whether an "implicit" finding by the Appellate Division that the evidence was legally sufficient would satisfy the federal exhaustion requirement.

[5] The letter from petitioner's Hiscock Legal Aid Society appellate attorney to the Appellate Division clerk has been included in the state court records.

including those that petitioner's counsel attempted to withdraw.  Thus, this court finds that all three claims were raised to the Appellate Division even if petitioner's attorney attempted to withdraw two of those claims.

However, in petitioner's application for leave to appeal to the New York Court of Appeals, he raised only the ineffective assistance of counsel claim and the excessive sentence claim.  He did ***not*** raise the weight of the evidence claim.  When he filed his section 440.10 motion to vacate, petitioner raised ***only*** the ineffective assistance of counsel claim and a ***new*** claim that petitioner's indictment was jurisdictionally defective.  Petitioner, therefore, has only raised his weight of the evidence claim in the Appellate Division and has failed to exhaust his state court remedies regarding that claim.

### B.  Procedural Default

If petitioner has not exhausted his state court remedies, but no longer has remedies available in state court with regard to these claims they are "deemed" exhausted but are also procedurally defaulted. *Bossett v. Walker*, 41 F.3d 825 (2d Cir. 1994)(citing *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991)), *cert. denied*, 514 U.S. 1054 (1995).  A state prisoner who has procedurally defaulted on a federal claim in state court is entitled to federal habeas review of that claim only if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court to consider the claim will result in a miscarriage of justice. *Id.* at 748.  A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477

U.S. 478, 496 (1986).

Petitioner cannot now return to state court to challenge the weight of the evidence or the legal sufficiency of the evidence since he has already raised the weight of the evidence claim on appeal to the Appellate Division, and he has already had his one opportunity for appeal to the New York Court of Appeals. *See Grey v. Hoke*, 933 F.2d at 120.  Petitioner cannot bring a legal sufficiency claim in a collateral motion because the weight of the evidence claim has already been decided on appeal, and this petitioner has already brought a collateral motion to vacate his conviction. *Id.* (citing N.Y. CRIM. PROC. LAW §§ 440.10(2)(a), 440.10(2)(c).  Because petitioner cannot return to state court, he has not only failed to exhaust his claim, but has also procedurally defaulted on his claim that the verdict was against the weight of the evidence.

Petitioner has shown neither cause nor prejudice for the procedural default.  His appellate counsel raised the issue in the Appellate Division, but did not raise it in the application for leave to appeal.  Absent cause and prejudice, the court may also excuse a procedural default if petitioner can show that the failure to review his claims would result in a fundamental miscarriage of justice in that petitioner was "actually innocent." *Sawyer v. Whitely*, 505 U.S. 333, 339 (1992).  To invoke this exception, the petitioner must show "factual innocence", not mere "legal insufficiency" and must present ***new and reliable evidence*** to show that it is "more likely than not" that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Moore v. Greiner*, 02 Civ. 6122, 2005 U.S. Dist. LEXIS 24184, *35-37 (S.D.N.Y. Oct. 19, 2005)(citations omitted).

Petitioner in this case has raised no new evidence that would show "factual innocence". The issue in this case was a question of intent and credibility. There is no question that petitioner and his co-defendant were the individuals who participated in the shooting. There is no question that petitioner's co-defendant shot at the victim several times, hitting the front of the house to which the victim was attempting to run at the time the shots were being fired. There is also no question that petitioner and his co-defendant switched places in the car and returned to the scene of the shooting so that petitioner could fire a few more shots. The jury simply did not believe that petitioner and his co-defendant were just trying to scare Mr. Logan. Thus, to the extent that petitioner's weight of the evidence claim could have been considered a legal sufficiency of the evidence claim, it may be dismissed.

**3.   <u>Standard of Review</u>**

The standard of review in a habeas action depends upon whether the state court considered petitioner's constitutional claims "on the merits." The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling ***on the merits*** of a federal constitutional issue was either "'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original). The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2).

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.* The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual finding was not fairly supported by the record. 28 U.S.C. § 2254(d) & (d)(8). The AEDPA requires the court to apply a more deferential standard, placing more restrictions on the power of federal courts to grant writs of habeas corpus to state inmates. *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

In addition to the requirement that the state court consider the petitioner's claim on the merits, the AEDPA provides that a state court's fact findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). If the State court has failed to adjudicate a claim "on the merits", the pre-AEDPA standard of review applies, and the court reviews both questions of law and mixed questions of law and fact *de novo. Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## 4.   **Ineffective Assistance of Counsel**

Petitioner raised his ineffective assistance of trial counsel claim throughout his state court appeals and has exhausted this claim. The Appellate Division clearly considered petitioner's ineffective assistance of counsel claim on the merits and, thus, the AEDPA standard applies. Therefore, the court may proceed to a further analysis.

The well-established Supreme Court precedent, provides that a claim of

ineffective assistance of counsel is sustainable only if counsel's representation fell

below an objective standard of reasonableness, and there is a reasonable probability

that, absent counsel's errors, the result of the proceeding would have been different.

*Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Claudio v. Scully*, 982 F.2d 798,

803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993).  In applying this test, a

reviewing court must be "highly deferential" and presume that counsel's conduct falls

within the range of reasonable performance.  *Strickland*, 466 U.S. at 689.

In his habeas application, petitioner claims that his trial attorney was ineffective

for various reasons.  Petitioner claims that due to detective Quonce's inconsistent

statements regarding how he found the guns in the crawl space, petitioner's counsel

should have moved to suppress the weapons.  Petitioner also claims that his trial

attorney did not object to bolstering of the prosecutor's witnesses' backgrounds or to

prejudicial remarks in the prosecutor's opening statement.  Petitioner also states that

although his attorney objected to Detective Vassinelli's testimony that the officers

remembered where petitioner lived, he failed to object to the prosecutor's opening

statement indicating that Detective Broton remembered where petitioner's mother

lived.

Petitioner also faults his trial counsel for failing to object when the prosecutor

asked Andrew Logan whether he was still "scared" the next day, when petitioner

states that Logan did not previously testify that he was scared.  Finally, petitioner

claims that his trial counsel failed to point out inconsistencies in the detectives'

testimony and "failed to mention" that the only way that the police were able to get a

statement from co-defendant Middlebrooks was to bring him to petitioner.  Petitioner claims that counsel should have requested a reopening of the *Huntley*[6] hearing.

A review of this case shows that the Appellate Division did not violate the AEDPA standard in finding that petitioner received "meaningful representation" and in denying his ineffective assistance of counsel claim.  There was no issue of identification in this case.  There was no question that petitioner and his co-defendant shot at Andrew Logan and then returned to the scene to attempt to shoot at him again.  Both defendants gave voluntary statements.  Thus, they admitted that they were in possession of weapons.  Police had interviewed other individuals and determined that petitioner and his co-defendant had borrowed the Corsica that night.  The issue was one of intent.

Part of petitioner's defense was that the gun that he was allegedly attempting to shoot was jammed or inoperable.  Petitioner needed the gun in order to argue that it was inoperable.  Suppression of the gun would not have helped petitioner in the least.  If the gun had been suppressed petitioner would not have been able to use it to argue that he could not have successfully shot at Andrew Logan.  The prosecution still had petitioner's statement that he had done something "stupid" even if he attempted to state that he only meant to scare Mr. Logan.

In any event, there was no basis for suppression of the weapons.  The detectives were in pursuit of two defendants who they had reason to believe were armed.  When they arrived at the address where they thought petitioner might be, they were certainly

---

[6] *People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).  A *Huntley* hearing challenges the admissibility of a defendant's statement.

justified in sending officers to the back of the house while other officers approached from the front to avoid any suspects escaping from the back door. Detective Quonce testified that the crawl space door looked like it had been recently opened, and that he could see a gun when he looked through the partially opened door. (T. 443).

Hot pursuit of a fleeing felon has clearly been an exception to the warrant requirement as has been the safety of law enforcement officers and bystanders. *See United States v. Berry*, 05-CR-40, 2006 U.S. Dist. LEXIS 9429, *8-9, 12-13 (D. Conn. March 2, 2006)(citations omitted). In petitioner's case, the officers had witnessed the defendants brandishing guns could reasonably believe that they still possessed those weapons or others. Thus, petitioner's attorney's failure to move to suppress the weapons was not unreasonable because the motion would not have been successful in any event.

Petitioner's claim that his attorney should have attempted to re-open the *Huntley* hearing because the police did not get a statement from **Middlebrooks** without bringing petitioner to Middlebrooks has nothing to do with the voluntariness of **petitioner's statement**. Petitioner had already given **his** statement to the police, and at the trial, the prosecutor asked Detective Broton about the warnings given to petitioner before taking his statement. It was clear that petitioner's statement was voluntary. Thus, counsel's performance was not deficient in this regard.

Petitioner's other claims regarding his attorney's performance all deal with alleged failures to object at various times during the trial. Petitioner argues that although his attorney objected when one of the officers testified that they knew where **petitioner** lived because they had prior dealings with him, petitioner argues that his

attorney failed to object when the officers testified that they knew where ***petitioner's mother*** lived.  This testimony allegedly implies that the police had prior dealings with petitioner, and therefore, the testimony was prejudicial to petitioner.  This court cannot find based on these claims against petitioner's trial counsel that the Appellate Division was acting contrary to or an unreasonable application of the *Strickland* test.

Petitioner also does not clarify how the prosecutor "bolstered" his witnesses' backgrounds to petitioner's detriment.  Petitioner is also incorrect when he states that Andrew Logan did not testify that he was scared.  On direct examination, Andrew Logan stated that he did not tell the police right away that he had seen Jondell Middlebrooks in the car because "it happened too fast, and I was nervous." (T. 373).  The prosecutor then asked "You were scared?"  To which Andrew Logan replied: "Yes." (T. 373).  Thus, later there was no reason for petitioner's counsel to object when Andrew Logan was testifying that he told his mother about the incident the next day, and the prosecutor asked "Were you still scared then?" (T. 378).  To which Logan again replied in the affirmative. (T. 378).  Thus, petitioner's counsel was not acting unreasonably by not objecting to the prosecutor's question.

A review of the trial transcript shows that the Appellate Division did not act contrary to or unreasonably apply *Strickland.*  As stated above, defense counsel's strategy was to attempt to show that petitioner and his co-defendant[7] did not intend to kill Andrew Logan.  The jury failed to believe petitioner's claim, notwithstanding his statements to the contrary.  Whatever minor inconsistencies petitioner alleges that defense counsel did not emphasize in the officer's testimony did not prejudice

---

[7] Petitioner's co-defendant of course had separate counsel.

22

petitioner.  Thus, petitioner's ineffective assistance of counsel claim may be dismissed.

## 5.   Sentencing

Petitioner claims that his sentence was excessive.  The Appellate Division clearly decided the sentencing issue on the merits, and petitioner raised the claim in his application for leave to appeal to the New York Court of Appeals.  Thus, the court may proceed with the analysis.

Claims arising out of state court sentencing decisions are not normally cognizable on federal habeas review as long as the sentence is in the statutory range. *Haynes v. Butler*, 825 F.2d 921, 923 (5th Cir. 1987), *cert. denied*, 484 U.S. 1014 (1988). *See also Estelle v. McGuire*, 502 U.S. 62, 67 (1991)(errors of state law are not grounds for habeas relief)(citation omitted)).  A claim that a sentence is excessive, however, is cognizable on federal habeas review if that sentence is outside the range prescribed by state statutory law. *Townsend v. Burke*, 334 U.S. 736 741 (1948); *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)(citation omitted).

In this case, petitioner does not claim that the sentence falls outside the statutory range.  In fact, petitioner's appellate counsel conceded in his brief that the sentence was simply the maximum for petitioner's conviction of Attempted Murder, Second Degree. Petitioner's Appellate Brief at 23-25.  Petitioner's counsel claimed that based upon petitioner's minor prior record, the court should have exercised its discretion to impose a shorter sentence.  Petitioner claims that the sentence is harsh and excessive

as applied to him.[8]  Since petitioner's sentence is within the statutory range for his conviction for attempted murder, and all petitioner's other sentences are shorter and run concurrently to the attempted murder sentence, petitioner's sentencing claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition (Dkt. No. 1) be **DENIED** and **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: June 12, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

[8] The court notes that in his appellate brief, petitioner's counsel never mentioned a "federal constitutional" argument, however, in his federal habeas application, petitioner has included some language that seems to raise a claim that petitioner's sentence was "disproportionate" to the crime. Petitioner's Brief in Support of Habeas Corpus at 15-16.  *See Lockyer v. Andrade*, 538 U.S. 63 (2003).  This language implies a constitutional Eighth Amendment claim that petitioner has never raised prior to this application and as such, is unexhausted.  To the extent that petitioner is attempting to raise an unexhausted Eighth Amendment claim, it may be dismissed because petitioner may not now go back to state court to raise this claim since he has already raised a sentencing claim on appeal and may not now return to raise a different sentencing claim on collateral review, rendering this claim procedurally defaulted.  The court would also point out, however, that petitioner does not seem to claim that his sentence was "disproportionate" **to the crime** of attempted murder, rather that the sentence was "disproportionate" **to petitioner** due to his minimal prior record and the facts of the case.  Thus, although petitioner uses constitutional language, he is still making a standard sentencing argument that is not cognizable in this court.